Christian, J.
I cannot concur in the opinion of the-majority of my brethren. "With the greatest respect for their judgment, I cannot bring my mind to assent to the-proposition that the agreement of the parties in this case, as evidenced by the writing sued upon, can possibly be-brought within the operation of the “Adjustment Act,” and subject to be scaled as a Confederate contract.
The obligation sued upon is in these words:
“$3,600. Three years after date, The Virginia Porcelain & Earthenware Company promise to pay to Thomas Calbreath (said plaintiff), his heirs and assigns, the sum of three thousand six hundred dollars, for a steam engine, saw mill, shingle machine and chopping mill, with all the fixtures and appurtenances, which sum, is to be paid in the currency used in the common business of the country at the date of maturity, bearing interest from date of the loritten. contract, which bears date the M day of March 1864.” (Signed by the President of the Company.)
How such a contract as this can be construed to be a contract to be discharged in “Confederate currency” is beyond my comprehension. If it was conceded that the parties had met together, the one to sell, and the other to purchase this property, and that it was by common-agreement «oí to be paid for in “ Confederate currency,” but that both parties were stipulating for a different currency, I cannot conceive of any words or forms of expression which the parties could have employed more clearly to express such intention than those used in the writing before us.
*715 To characterize this writing as an obligation to be discharged in Confederate currency, is to say that every contract, no matter what may be its express t-erms, is a contract to be discharged in “Confederate currency,” provided it was entered into between the 1st of January 1862, and the 10th of April 1865, even where it is plain that the parties were stipulating in express terms for a different currency.
If parol evidence can be admitted to explain, vary or contradict such an obligation as this, where there is not the slightest ambiguity, either latent or patent; then it may be done in every case; for as I shall show presently, this is not one of those cases provided for by the adjustment act, and must be decided upon principles- outside of that act. If, I repeat, we can look to the parol proof in this case, in a contract where there is not the slightest ambiguity even suggested, and where upon its face it is not to be discharged in Confederate treasury notes, but, by express terms, in another currency—and consequently is not within the purview of the statute—then we are establishing, in my humble opinion, a most dangerous • precedent. We strike a deadly blow at those principles of the common law which, under the jurisprudence of-this country, have ever been held sacred, and which form the basis to uphold and the shield to protect the inviolability of contracts.
If I can show (as I think it is easy to show) that the contract under consideration was not, according to the true agreement of the parties, to be fulfilled or performed in Confederate treasury notes, and was not entered into with reference to said notes as a standard of value, then we have, by the decision of the majority, a case which overrules every decision of this court from the time of' its first constitution, which has uniformly declared that no parol evidence shall be admitted to vary, alter or-contradict the plain written terms of the contract. And. *716 it is against that decision that I 'most earnestly protest and record my dissent.
H°w can it possibly be maintained that this contract was to be performed or fulfilled in Confederate treasury notes, when it is expressly stipulated that it is not to be 80 aQd performed, but is “to be paid in the currency used in the common business of the country at the date of maturity,” to wit: on the 3d day of March 1867 ? How can it be said that it “ was entered into with reference to such currency as a standard of value,” when a different currency is expressly referred to and agreed to be paid, as the value deliberately fixed by all parties, when such a conclusion is expressly excluded by thejerms of the bond ?
This case cannot be brought within the' operation of the statute known as the adjustment act, except upon Ihe theory that the statute covers every case which was •entered into between the 1st of January 1862, and the 10th of April 1865, even if (as was admitted by the counsel for the appellee) it stipulated for the payment of gold. ‘The contract in this case is just as definite and fixed as to the currency in which it is to be discharged as if it ■was payable in gold. If this is the true construction— 'if the statute means this—then all I have to say is, that it is unconstitutional and void, because it impairs the • obligation of contracts.
■ But the statute, properly construed, is not unconsti■■tional, hut is one eminently wise and proper, and which '•the exigencies of the country and the abnormal condition •of affairs imperatively demanded. ■
But what is the character of those contracts, which, -under the statute, may be scaled, either by reducing the nominal amount to the gold value or to the value of the ¿property the subject of the consideration ?• In such contracts, and such, only, can the scale of adjustment be applied, as where “ it shall appear that according to the *717 true understanding and agreement of the parties (of both parties not of one), the contract was to be fulfilled or performed in Confederate treasury notes, or which were entered into with reference to said notes as a standard of value.”
Can it be possible that where both parties have solemnly stipulated in writing the kind of currency in which the contract is to be fulfilled or performed, and have indicated in writing the currency, with respect to which, as a standard of value, it was entered into, and that currency is not Confederate currency, can it be possible that such a contract is to be declared a Confederate contract, and subject to be scaled %
In this case it appears, by the express terms of the contract, that it was not to be fulfilled andjperformed in Confederate States treasury notes, and was not entered into with reference to such notes as a standard of value. It was, therefore, not a case to which the statute applies, and not a case in which, in my opinion, parol evidence could be heard at all.
But does the parol evidence, conceding that it can be admitted, make it appear that the true understanding and agreement of the parties was different from that expressed in the written agreement.
The obligation is signed by William Withrow, president Virginia Porcelain and Earthenware company. He gives no account of his understanding of the agreement, except as shown by the solemn act of signing his official name as the president of the company, and acknowledging himself as bound by the terms of the written contract. He is presumed to have read a paper by which he bound the company to pay $3,600, and to have understood the terms of that contract; when and in what currency it was to be paid. He, the president of the company, was not examined as a witness, who was, in fact, the party to' the contract, and whose official signature could alone bind the company. What the true under *718 standing and agreement of the company was is shown by ^ie signature of the president to a paper under seal de°^ar^nS ^ Plainly and unequivocally without the slightest ambiguity on its face.
What we want to get at under the statute is, what was the true understanding and agreement of the parties ? Who are the parties ? Thomas Calbreath on the one hand and the Virginia Porcelain and Earthenware company on the other. Thomas Calbreath produces the written agreement upon which he demands the fulfillment of his contract, as his true understanding and agreement, and the Porcelain company acknowledged it as their agreement by the signature of their president, the only officer authorized to bind them. What boots it then, that Messrs. Bell and Shelton, the agents who negotiated the pui’chase of this property, should give in their views of -what they thought (in their several interviews with the plaintiff), about Confederate money being the currency of the country three years after the 3d of March 1864 ; about their unwavering confidence in the success of the Confederate cause? The question is not what ■ these agents thought, or hoped or expressed, but what - was the true understanding and agreement of the parties to this contract—of both parties to this contract—of ' Thomas Calbreath and of the Porcelain company. Neither the hopes nor the expectations nor the patriotism of these agents can interpret the contract of the parties. But in point of fact these agents do not pre- ■ tend to prove (if their’evidence is tobe looked to at all), . a different agreement from that set out in the written • contract; but-on the contrary, they both confirm and establish it as> the true agreement of the parties.
Bell says that he and. Shelton purchased the property as agents of the company.; that they had several interviews with the plaintiff' before they made the purchase ; that finally a’contract was made and reduced to writing, -and that the' tQ.r,ms setfoHh in the obligation sued upon are *719 the same terms set forth in the contract. And while, he says, he (Bell) thought of no other money but Oonfederate money, yet that nothing was said by him to the plaintiff, or by the plaintiff to him, about what kind of money was tojbe paid. And he expressly states that he •offered Confederate money to the plaintiff and he refused to receive it, stating he preferred the terms as they were' agreed on.
Shelton says, they had several interviews with the plaintiff; and finally made a contract with him which was reduced to writing ; that the terms set forth in the paper in the suit, are the exact terms agreed upon. He also proves that nothing was said about the kind of currency in which the obligation was to be discharged ; that he expected that it would be discharged in the money that was the currency of the country at the time of its: maturity; but he expected that would be Confederate currency. He also distinctly proved that they offered the plaintiff Confederate money, and he refused to receive it.
These are the only two witnesses introduced by the defendant. Neither of them pretend to prove either that Calbreath, the plaintiff, or the president of the company, who executed the contract, made any other agreement than the one sued upon. Giving the utmost weight to the statements of these witnesses, the most that can be said is, that,they thought that the same currency would be in existence in 1867, which was then the currency, and, therefore, the contract was to be discharged in that currency ; and it appears they did not •even communicate these thoughts and hopes to the plaintiff; and yet it is gravely asked, why did not Calbreath disclose to the agents that he was not contracting with reference to Confederate money % Disclose it to them ? How could he have more plainly disclosed it than he did? Was not his refusal to receive Confederate money a disclosure of his purpose ? Did he not disclose his pur *720 pose, when he deliberately put in writing that this “sum is to be paid in the currency used in the common business of the country at the date of the maturity ” of this obligation ?
But it is said that, plain as this contract is written, there is some sort of a presumption, that the parties did not mean what they said, because they lived under the government of the Confederate States, and must be presumed to have contracted with reference to the currency of that government, and not of another ; and that, therefore, when they stipulated for such currency as may be used in the common busiuess of the country ” in the year 1867, we must construe their contract, by adding the words, ‘ ‘ provided, that currency shall remain as it is, Confederate treasury notes,” and thereby they are made to contract for the very thing they are seeking to avoid.
Surely everybody must admit, that a man had a right to sell his property in March ’64, for a better currency than the worthless trash then current. When he parted with his property there was, surely, nothing illegal, or immoral, or even disloyal, in his seeking to secure for it a sound currency. Why should there be any legal presumption against such a contract ? Upon what principle of law or reason can such a presumption be raised % Especially, how can it be raised in this case, against a man who positively refuses to receive Confederate money, and expressly stipulates that he is to receive another currency ? This violent and illegal presumption is to be raised in the face of the written contract, in the face of the fact, that he has refused to sell his property for Confederate money, in the face of the fact that he- thought (as many did), in 1864, that the Confederacy’ would be a failure; because, forsooth, he was a citizen of Virginia, and Virginia was one of the Confederate States, and it must therefore, be ■ presumed he was not contracting for the currency of the *721 United States, then at war with the Confederate States. There might be some reason in raising such presumptions against the citizen of a government which had established its independence, and whose separate nationality had been recognized by the other nations of the world. But surely no such presumption can be raised against the citizen of a government which never had one day of peaceful existence, but whose every day’s existence, from the stormy cradle of its birth to its bloody and untimely grave, was a struggle for life.
But certainly and beyond all question, no legal presumption can be raised against the plain written terms of the contract. And I insist that it was not only lawful, but it was eminently proper in every prudent man who was about to part with his property as late as the year 1864, to stipulate for a currency other than Confederate currency, when it was then depreciated twenty for one, and steadily and rapidly going down every day.
But I understand that the principle now settled by this court is this (I state the very words of the proposition) ; that where parties enter into a contract during the war with reference to Confederate money as a standard of value, payable at a future fixed period, in such currency as may be current at the maturity of the contract, the presumption is, in the absence of evidence to the contrary, that the parties intended to pay in Confederate currency.
ITow this is begging the question in this case. It is assumed, that this contract was entered into with reference to Confederate currency as a standard of value, when, in fact, another and different currency is pointed to as the standard of value fixed by the parties by the express terms of their agreement; and when the very witnesses who swear that they understood the value to be ascertained with reference to Confederate currency, prove distinctly that $3,600 was worth only $140, and at the same time that the property sold was worth *722 $1,000; and. when it is shown, too, that the property sold was worth from $1,000 to $2,500 in gold, and when the court fixes the value at at least $1,400. I say it is begging the question to say that property thus valued on all hands was valued mth reference to Confederate currenciJ> i-11 the face of the written contract, and in face of the fact that the value- of the Confederate currency was worth only $140, when the value of the property sold _ was worth from $1,000 to $2,500.
I think it is plain that in this case both the written contract and the parol evidence show conclusively that it is not shown that (in the language of the statute) the true understanding and agreement of the parties the contract “was to be fulfilled or performed in Confederate States treasury notes, or was entered into with reference to said notes as a standard of value, but that by the express terms of the contract, it was to be discharged in another currency, and was entered into with reference to another and different currency as a standard of value; and it was, therefore, error in the court below to scale the debt as a Confederate contract.
It is the province and the duty of this court to execute the contract of the parties; and when the contract has been fairly entered into, where no fraud is charged or proved, the court ought not to be deterred froto executing the contract because a high price has been agreed to be paid upon a long credit.
But it must be conceded that where the parties have deliberately entered into a written contract, and especially where there is no proof that the understanding and agreement was different from the written contract, that written contract ought not to be ignored and.set aside, because (as in this case) the agents of one of the parties had certain hopes and expectations and confidence in the success of the Confederacy and the continuance ■ of the same currency.
The law is, that where the'true understanding and *723 agreement of the parties—of both parties, not of one— was that the contract should be fulfilled and performed in Oonfedei’ate States treasury notes, or was entered into with reference to said notes as a standard of value, then, and only then, is the contract to be scaled. And yet we are to set aside the solemn written agreement of the parties, because one of them (and in this case his agent) may choose to say that he was looking to a payment in Confederate currency, because he had confidence in the success of the Confederate cause. We are thus substituting the hopes and expectations of one of the parties for the solemn agreement of both of the parties, as evidenced in writing. I can never assent to such a proposition. I ana for executing the contract of the parties which they have deliberately made for themselves. I am for reversing the judgment.
Staples, J.
The questions of law and fact arising in this case were, by consent of parties, referred to the judge of the court for adjudication. Where this is done, the same weight and effect will be given to the decision in an appellate court, that are given to the verdict of a jury. In this case the judgment is in accordance with justice and is not plainly in conflict with the evidence ; and I am not disposed to disturb it. TJpon all the points involved, I refer to my opinion in Hilb v. Peyton, as containing all I desire to say.
Moncure, P. concurred in the opinion of Christian, J.;
Bouldin, J. concurred in the opinion of Anderson, J.
Judgment aeeirmed.